ESTATE OF JAMES A. YEOHAM, DECEASED, AND VELMA YEOHAM, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Yeoham v. Commissioner
Docket No. 17286-83.
United States Tax Court
T.C. Memo 1986-431; 1986 Tax Ct. Memo LEXIS 179; 52 T.C.M. (CCH) 451; T.C.M. (RIA) 86431; September 11, 1986. Leon Crum, for the petitioners. Linda L. Wong, for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: Respondent determined deficiencies in and additions to petitioners' Federal *181 income taxes as follows: Additions to Tax
Year
Deficiency
Section 6653(a) [1]
1979
$134,320.00
$6,716.01
1980
128,941.96
6,447.10
1981
19,475.94
973.80
After concessions, the issues remaining for decision are: (1) whether certain "trust organizations" are recognizable for Federal income tax purposes; (2) if they are so recognizable, whether petitioners are taxable on the income of the organizations under the grantor trust provisions of sections 671 through 679; (3) whether petitioners are liable for additions to tax under section 6653(a); and (4) whether petitioners are liable for damages under section 6673. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation and exhibits associated therewith are incorporated herein by reference. Petitioners are Velma Yeoham and the estate of her deceased husband, Dr. James Yeoham. In 1979 and 1980, Dr. and Mrs. Yeoham resided *182 in Irving, Texas and filed joint income tax returns. During 1981 Dr. Yeoham died and for 1981, a joint income tax return was filed for Dr. Yeoham, deceased, and Mrs. Yeoham, who resided in Irving, Texas, at the time the petition was filed. During the years at issue and for several years prior thereto, Dr. Yeoham was engaged in the practice of surgery. In 1977, he had become a member of the American Law Association ("ALA") after attending an introductory membership program at which he was provided a package of pre-printed forms for establishing "trust organizations." After receiving the forms, Dr. Yeoham traveled with his wife in July, 1977 to one of the islands in the British West Indies. While on the island, they used the forms purportedly to create three trusts, i.e., Candu Trust Organization ("Candu"), Willdu Trust Organization ("Willdu"), and Maydu Trust Organization ("Maydu"). The instruments purportedly creating these organizations were signed by one or both of the Yeohams as "exchangors," and by Lloyd Roberts, a resident of the island, as "creator." After returning to Texas, the Yeohams, in November 1977, purportedly created another trust in Texas known as PACA Properties *183 ("PACA"). The Yeohams individually and Dr. Yeoham's professional corporation were the exchangors of PACA, and John Drew was its creator. The trust documents recited that the Yeohams and their children owned all 100 "trust certificate units" in Candu, Candu owned all 100 trust certificate units in Willdu, Willdu owned all 100 trust certificate units in Maydu, and Maydu owned all 100 trust certificate units in PACA. According to the documents, the Yeohams and Dr. Yeoham's professional corporation transferred to Maydu all of the equipment and supplies theretofore used by Dr. Yeoham in his medical practice as well as a piece of real property located in Missouri. The Yeohams also transferred three automobiles to PACA. In the trust documents the Yeohams were designated trustees for Candu; Candu was designated trustee for Willdu; and Willdu was designated trustee for Maydu and PACA. Each of the preprinted instruments that purportedly established the trust organizations provided: The named Trustee(s), for themselves and their successors in trust irrevocable do hereby accept the conveyance and acknowledge delivery of all the property specified, together with all the terms of the Trust *184 Organization herein set forth, agreeing to conserve and improve the Trust Organization, to invest and reinvest the funds of said Trust Organization, in such manner as will increase the financial rating of the Trust Organization exercising their best judment and discretion, in accordance with the Trust minutes, making distribution of portions of the proceeds and income as in their discretion, and according to the minutes, and upon the final liquidation distributing the assets to the existing certificate holders as their contingent rights may appear; and in all other respects administering said Trust Organization in good faith, strictly in conformity hereto. The designated trustees of each trust could be removed only by a unanimous resolution of the board of trustees or by a court and the trustees were empowered to appoint a successor for any trustee who died or was removed for any reason. Under the trust documents, the trustees were provided with extremely broad powers with provisions such as the following: Trustees' powers shall be construed as general common-law powers of citizens of the Colony of Turks and Caicos (Islands) [2] to do anything any citizen may due in any state *185 or country. They shall, but not be limited to, continue in business, conserve the property, commercialize the resources, extend any established line of business in industry or investment, as herein specially noted, at their discretion for the benefit of this Trust Organization such as, viz: buy, sell or lease land for surface or mineral rights; buy or sell mortgages, securities, bonds, notes, leases of all kinds, contracts or credits of any form, patents, trademarks or copyrights; buy, sell, or conduct mail-order business, or branches thereof; operate stores, shops, factories, warehouses, or other trading establishments or places of business of any kind; allocate funds derived from any source for charity, religion, education, research, accumulating, or other purposes, whether for immediate or future application to be managed by specified Trustee, Trustees, or others as designated by the Trustee's minutes; construct, buy-sell, or lease or rent any type of real estate, improved or unimproved; advertise different articles or business projects; borrow money for any project, pledging the Trust Organization property for the payment thereof; hypothecate assets, property, or both; own stock *186 in, or entire charters of corporations, or other properties, companies or associations as they may deem advantageous. Resolutions of the Board of Trustees authorizing a special thing to be done shall be evidence that such act is within its power. Anyone lending or paying money to the Board of Trustees shall not be obliged to see the application thereof. All funds paid into the treasury are and become a part of the corpus of the Trust Organization. With regard to the duration and termination of the trusts, each instrument provided: This Trust Organization shall continue for a period of twenty-five years from date, unless the Trustees shall unanimously determine upon an earlier date. The Trustees may at their discretion, because of threatened depreciation in values, or other good and sufficient reason, liquidate the assets, distribute and close the Trust Organization at any earlier date determined by them. The Trust shall be proportionately and in a pro rata manner distributed to the Certificate Holders. The rights of the holder of a trust certificate in each of the trust organizations were defined as *187 follows: Ownership of certificate shall not entitle the holder to any legal title or equitable title in or to the Trust Organization property, nor any undivided interest therein, nor in the management thereof, nor shall the death of a holder entitle his heirs or legal representatives to demand any partition or division of the property of the Trust Organization, nor any special accounting. The rights of the certificate holders in personam are limited merely to a claim against the trustees to carry out that Declaration of Trust. In December 1977, Dr. Yeoham, in his individual capacity, and Mrs. Yeoham, as an agent for PACA, executed a contract under which PACA agreed to lease an automobile to Dr. Yeoham. The automobile was one of the three originally transferred by the Yeohams to PACA. Dr. Yeoham, in his individual capacity, and Mrs. Yeoham, as a trustee for Maydu, executed in August 1978 a "contract for services" in which Maydu agreed to provide to Dr. Yeoham the following: (1) office furniture and equipment; (2) medical supplies; (3) "research and consultation;" (4) maintenance of rental equipment; (5) office space; (6) legal and accounting fees; and (7) management services. *188 The personal property leased by Maydu to Dr. Yeoham initially was the same property Dr. Yeoham had transferred to Maydu in 1977, and the office space was the same space of which Dr. Yeoham had been lessee prior to the creation of Maydu. The management and maintenance services were performed by Mrs. Yeoham, who was Maydu's sole employee. The "research and consultation" services included a subscription to he Wall Street Journal and a seminar on investing money. Until he became ill, Dr. Yeoham was Maydu's only source of income except rental income from the Missouri property. During the years 1979 through 1981, Dr. Yeoham made payments to Maydu for purported services and to PACA for purported car rentals totaling $364,626. All of the payments were deducted as business expenses on the Yeoham's joint returns for 1979, 1980 and 1981. OPINION Respondent first contends that the trust organizations are not entitled to be recognized for income tax purposes. On their part, petitioners contend that the organizations are valid common law business trust organizations which were set up for legitimate business purposes, including the reduction of premiums on Dr. Yeoham's malpractice insurance. *189 The "sham" contention as asserted in this case requires that we not only examine the organizational documents and surface transactions of the entities involved, but it also requires that we examine their economic realities. , affd. per curiam . In other words, we must look beyond the "superficial formalities of a transaction to determine the proper tax treatment." , affg. . Labels, semantic technicalities, and formal documents do not necessarily control the tax consequences of a given transaction. Instead, we must be concerned with economic realities and not the form employed by the parties. . Moreover, transactions which are devoid of economic substance and are engaged in solely to acquire tax benefits should be disregarded, ; ; , *190 and the determination of whether the transactions and entities lack economic substance is a factual question that must be decided within the unique parameters of this case. . Additionally, the fact that all of the entities involved herein were controlled, either directly or indirectly, by the Yeohams requires that we closely scrutinize all transactions in order to determine their substance. , affd. ; . In prior cases, we have applied the above principles to trust organizations which were almost identical to those in this case. See , affd. ; . In both Zmuda and Professional Services we concluded that the trust organizations were paper entities structured solely to avoid taxes and therefore not recognizable for income tax *191 purposes because the creation and use of the trust organizations did not alter in any way the taxpayers' economic relationship to the properties transferred to the trusts by the taxpayers. The terms and conditions of the documents purportedly creating the organizations left the taxpayers in exactly the same relationship to the properties after the "transfers" that they were in prior to such transfers. In the case before us, the Yeohams were the trustees of Candu, which was the trustee of Willdu, which was the trustee of Maydu and PACA. Thus, in effect, the Yeohams were the trustees of each trust organization and, as such, had unrestricted authority to act in any manner with respect to the property owned by all of the organizations.Furthermore, the Yeohams and their children owned, directly or indirectly, all of the certificates in all of the trusts which entitled them to all of the organizations' assets upon their termination. Moreover, the purported transfers did not create any proprietary rights in anyone other than the Yeohams. Although the trust organizations were allegedly "created" by third parties, these parties were nominees only and neither had nor acquired any power *192 over or rights in the assets. For the reasons set forth above, we agree with respondent that the trust organizations lacked any economic substance and were formed solely to generate tax deductions. Therefore, they and the transactions with them cannot be recognized for income tax purposes. [3]
Additions to Tax Under Section 6653(a)
Respondent's determination that petitioners are liable for the addition to tax for negligence under section 6653(a) is presumptively correct and the burden of proving that the determination is erroneous is upon petitioners. ; Rule 142(a). In view of the complicated and suspect nature of the trust organizations as well as the large amount of money involved, we believe that a reasonable and prudent person would have made serious and prolonged inquiries into the validity, tax and otherwise, of the program used by petitioners. However, the record before us contains no evidence which tends to establish that petitioners *193 made such inquiries. We conclude terefore that respondent's determination with respect to the addition to tax is correct. Damages Under Section 6673
Finally, we turn to respondent's request that damages be imposed against petitioners under section 6673 for having instituted or maintained a proceeding primarily for delay or to present a position that is groundless and frivolous. Petitioners instituted and continued to maintain their position herein after our decisions in , and , had clearly established that trust organizations like those in this case are shams and are not recognizable for income tax purposes. It is apparent, therefore, that petitioners instituted and maintained this proceeding primarily for delay. Consequently, damages in the amount of $5,000 are awarded to the United States under section 6673. See . Decision will be entered for respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended during the years in issue, unless otherwise indicated. All rule references are to the Tax Court Rules of Practice and Procedure unless otherwise provided.↩
2. The PACA documents referred to "citizens of the United States."↩
3. Because we find that the trust organizations are to be treated as nullities, it is unnecessary to address respondent's argument concerning the grantor trust rules.↩